IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,                    14-CR-6136G


             -v-                             **GOVERNMENT'S TRIAL
                                             MEMORANDUM**


COLIN MONTAGUE a/k/a Uncle a/k/a C
SHELDON PALMER
CLUETH BURTON a/k/a Bobby,

                              Defendants.
_____


        THE UNITED STATES OF AMERICA, by and through its attorney, James P.

Kennedy, Jr., United States Attorney for the Western District of New York, Robert A.

Marangola and Brett A. Harvey, Assistant United States Attorneys, of Counsel, hereby files

its Trial Memorandum.


## OVERVIEW OF NARCOTICS CONSPIRACY


        This case involves a long-term, multi-agency wiretap investigation that targeted a

nationwide organization involved in the distribution of cocaine and cocaine base.   Colin

Montague was the head of a large and sophisticated cocaine distribution organization based in

Rochester, New York, and had numerous people working for him as members of the

organization, including Charlton Osbourne, Sheldon Palmer, Lemuel Jones, Alyssa Sprague,

Vidal Smith, Shawn Bernard and others.   Antoine Shannon was one of Montague's principal

1

cocaine customers in the Rochester area.   Shannon, in turn, supplied Collin Thomas with cocaine, which Thomas cooked up into crack and sold to his customers.   Joey Esposito, Akil Lazarus, and Clueth Burton a/k/a Bobby were also supplied kilogram quantities of cocaine in the Rochester area.

The organization consisted of west coast suppliers located in California and Arizona, along with Sheldon Palmer and other associates who coordinated the purchase and shipment of kilogram quantities of cocaine to New York.   Various associates operating in Rochester performed different but essential functions in order to enhance, promote and sustain the narcotics conspiracy.   These responsibilities included, for example, searching, renting and maintaining apartments for packages of cocaine to be shipped to and stored; directing couriers to locations when shipments of cocaine arrived; transporting cocaine shipments to others for distribution; obtaining quantities of cash in exchange for cocaine; counting, packaging, transporting, and shipping quantities of cash to California for future purchases of cocaine.   The operation was highly organized and compartmentalized and, ultimately, lucrative.   The proceeds generated from the sale of cocaine in Rochester, New York, over the course of the charged conspiracy period climbed into the millions of dollars, and the amount of cocaine involved in the relevant conduct far exceeds the 150-kilogram threshold under Title 21, United States Code, Section 848(e)(2) triggering mandatory life imprisonment, as well as the 5-kilogram threshold under Title 21, United States Code, Section 841(b)(1)(A) triggering either 10, or 20 year mandatory minimum terms of imprisonment.

In December 2013, agents and investigators applied for the first of roughly 20 wiretaps on cellular phones belonging to various members of the conspiracy, including Colin Montague, Antoine Shannon, Lemuel Jones, Collin Thomas, Charlton Osbourne, and Alyssa Sprague.   Between December 2013 and June 2014, investigators intercepted thousands of pertinent phone calls, many of which detailed the inner workings of the organization, arrangement of meetings to discuss conspiracy business, locations of drug and money transactions, etc.   In addition to the wiretaps, investigators also placed several high definition surveillance "pole" cameras at key locations, including outside the residence of Antoine Shannon at 68 Leroy Street, Shannon's mother's residence at 55 Polaris Street, Lemuel Jones' residence at 154 Park Avenue, a stash house at 151 Eugene Street, and three locations in Scranton, Pennsylvania, that were being used to ship cocaine from California.

At trial, the government intends to introduce numerous telephone calls and text messages between the conspirators which were intercepted between December 2013 and June 2014.   The calls and text messages involve conversations between and among several co-conspirators, including Colin Montague, Charlton Osbourne, Sheldon Palmer, Antoine Shannon, Joey Esposito, Lemuel Jones, Akil Lazarus, Alyssa Sprague, Jara Jenkins-Carmichael, Vidal Smith, and Chrystine Martins.   The government will also introduce text messages obtained from seized cell phones.   In connection with the calls and text messages, the government will play pole camera video recordings which coincide with and/or corroborate certain calls or events being proven to the jury, such as money being picked up and/or cocaine being dropped off, as well as meetings to discuss upcoming shipments of cocaine.

The investigation culminated in the interception of a series of telephone calls during the last two weeks of June 2014 indicating that a fresh shipment of cocaine was about to be transported to the Rochester area for Montague's operation.   Through the intercepted calls and texts and surveillance, investigators were able to identify the car used to transport the cocaine, and followed the car from Scranton, Pennsylvania, to the Rochester area where it was finally stopped by police.   Vidal Smith a/k/a "V" was the driver and sole occupant of the car.   Officers searched the car and found six kilograms of cocaine inside.

After the seizure of six kilograms of cocaine from the car, numerous search warrants were executed at the residences of Montague and several of his workers and customers. During the course of these search warrants, and searches of other locations in the months following the take-down, officers seized a large quantity of cash, narcotics, guns, cell phones, money-counting equipment, as well as shipping labels and products.   The government intends to introduce evidence obtained from these search warrants.

One of the search warrants executed on June 26, 2014 was at Colin Montague's residence at 152 Bright Autumn Lane in Greece, New York.   At that location, officers seized, among other things, detailed ledgers of Montague's drug trafficking activities.   The ledgers contain detailed information about Montague's drug customers and workers, cocaine amounts distributed, prices charged per kilogram, dollar quantities owed and paid.     In addition to the detailed records of the cocaine transactions, Montague's ledgers contained calculations identifying amounts paid or owed to members of the Montague drug trafficking

organization.   The government intends to offer these ledgers, as well as testimony from drug customers as well as members of the organization listed in the ledgers.   The ledgers reflect that during the period from September 12, 2013 to February 2014 alone, Montague distributed approximately 280 kilograms of cocaine.

The government also intends to offer proof of significant events which occurred during the conspiracy time period but preceded the investigation.   For example, in January 2013, Montague and over a half dozen members of the organization conducted a meeting at the Ritz Carlton in Atlanta, Georgia, to discuss and plan how to make the drug operations run more smoothly.   The government will also offer proof of law enforcement seizures of drug proceeds during the conspiracy from co-conspirators Alyssa Sprague ($143,000 in 2012) and Jermaine Swaby ($51,860 in 2008 and $36,132 in 2013).

## OVERVIEW OF MONEY LAUNDERING CHARGES

As a result of the substantial income Montague generated from the long-standing operation of this continuing criminal enterprise which he supervised, Montague needed a way to conceal his ill-gotten gains.   In 2007, Montague started a real estate business named Montague Enterprises, Inc. (MEI).   MEI is a C corporation, and Colin Montague is 100 percent owner of MEI.   New York Secretary of State records show that he is also the Chief Executive Officer of the corporation and that his former residence at 152 Bright Autumn Lane is identified as the Principal Executive Office.   Beginning in October 2007 and continuing through June 2014, MEI purchased approximately 47 residential properties in Rochester and

Cleveland, Ohio.   During the same period, MEI sold approximately 12 of those properties. By June 2014, MEI owned 35 properties.

The government will offer bank records along with witness testimony and summary exhibits[1] for bank accounts in the name of Colin Montague and MEI for the period from September 2007 to June 2014.   The records show that for the period from September 2007 to June 2014, a total of $5,441,455 was deposited into the accounts.   Of this amount, $2,007,520 was via cash deposits; and $759,304 was via deposits in money orders.

Additionally, the government has made a conservative calculation of the amount of deposits into these accounts, which cannot be credibly explained as rents, proceeds for sales of houses or transfers among the various accounts (unexplained wealth).   The estimate of rental income used was over $982,000; the sales proceeds for the properties sold during the period in question equals $974,100; and the total amount of inter-fund transfers equals $638,292.   When you subtract these amounts from the total deposits, an extremely conservative calculation of unexplained wealth equals over $2.8 million.

Montague also laundered drug proceeds by use of money orders.   Cooperating witnesses, including employees of MEI, will testify that Montague and several of his co-conspirators (Shawn Bernard, Charlton Osbourne and Rachel Vail) would regularly hand over to Montague's workers thousands of dollars in cash and instruct the workers to buy

---

[1] The bank records, as well as spreadsheets containing the account information for the various bank accounts, were provided to the defense in October 2017.

money orders with the cash.   Bernard and Osbourne took drug cash proceeds and gave them to workers including Lemuel Jones and Michael Mosgrove with instructions to go buy money orders at post offices and other locations that sold money orders.   Blank money orders were filled in with fictitious payor information and stamped with MEI as the payee. The purchased money orders would then be deposited in MEI's accounts or used to pay for other expenses of MEI.   For example, closing records for at least one of the properties show that MEI used thousands of dollars in money orders to pay for the purchase of that property.   Workers would write in the memo line of the money orders fake information such as "siding," "deck repair," etc.   The bank records show that numerous money orders containing these types of notations were deposited into MEI's accounts, and witnesses will identify examples of them.

Large sums of cash were also laundered through MEI.   For example, there will be testimony that thousands of dollars in drug proceeds were given to Clive Hamilton to pay for MEI expenses including repairs and maintenance on houses, and that large stacks of money were delivered to the MEI office to be deposited in the bank accounts.   This is consistent with the contractor account at Home Depot held by Montague Enterprises and Clive Hamilton. Records from Home Depot reflect that during the two-year period from May 2012 to June 2014, a total of approximately $86,543 in purchases was made under that Montague Enterprises/Clive Hamilton contractor account at Home Depot.   Of this amount, approximately $51,747 was in cash.

Montague would also give large sums of cash to others and have them purchase a bank check or cashier's check, which Montague then deposited into MEI accounts.   Montague would pay a fee of 3% - 4% for this service.

7

MEI would issue payroll checks to individuals as if they were employees of MEI even though they never actually worked for MEI.

Counts 4 through 9 charge six substantive money laundering counts under 18 U.S.C. § 1957.   Each count alleges a particular financial transaction wherein money was transferred out of MEI's bank account at Chase and paid to the IOLA account of James Marino, Esq., to pay for the purchase of a particular property.   The transfer of money is established via records for the Chase Bank account as well as the closing files for the particular real estate transactions.

To assist the jury in understanding the money laundering evidence in this case, the government will offer the testimony of IRS Special Agent Ryan Talbot and financial analyst Scott Deming.   Special Agent Talbot will testify as a money laundering expert and briefly explain what money laundering is and describe the various methods of laundering money utilized by drug dealers.   Scott Deming, a financial analyst employed by the U.S. Attorney's Office, will testify concerning summary charts of the bank accounts of MEI and Colin Montague and identify the bases underlying the unexplained wealth calculation set forth above.

# TYPES OF EVIDENCE

## A.  ACCOMPLICE OR CO-DEFENDANT WITNESS TESTIMONY

The government anticipates calling numerous cooperating witnesses who will describe their involvement with others in the narcotics conspiracy and/or money laundering activities. Nearly all of them were charged in the original complaint, or in one of the indictments returned in the case.   While on the stand, they will review certain phone calls that will be played and/or text messages displayed for the jury, identify the participants to the conversation, certify the accuracy of the transcripts and provide any required explanation and context for the calls.   They will also be asked to view various video clips that will be played before the jury, identify the individuals depicted in the photographs or videos, and provide any required explanation of the activities.   They will be asked to identify seized evidence, including cell phones, documents, photographs, and contraband.

## B.  LAW ENFORCEMENT TESTIMONY

The government intends to call numerous law enforcement witnesses to provide testimony regarding, among other things: (a) the wiretap; (b) surveillance; (c) search warrant results, including downloads of seized cell phones; and (d) the arrests of the defendants and co-conspirators.

C.      **BUSINESS RECORDS AND SUMMARIES**

The government may offer voluminous business records pursuant to F.R.E. 803(6), including bank records, Home Depot contractor records, MEI records, real estate closing records, rental car records, and SYTEC records concerning wiretap data from cell phones utilized by conspirators.   To assist the jury in evaluating the evidence, the government may introduce summary or demonstrative charts of these records pursuant to F.R.E. 1006.


D.      **EXPERT TESTIMONY**

Absent a stipulation, the government will call chemist Babita Joseph with the Drug Enforcement Administration and Nicole Flaitz with the Monroe County Crime Laboratory to testify regarding the chemical analysis of cocaine that was seized in this case on June 26, 2014.   Drug seizures include:

    (a)      2010 Nissan Altima (Vidal Smith);
    (b)      103 Canton Street (Joey Esposito);
    (c)      127 Campbell Park (Alyssa Sprague);
    (d)      369 Estall Road (Collin Thomas); and
    (e)      154 Park Avenue, Apartment #3 (Lemuel Jones)

As noted above, the government will also offer the testimony of IRS Special Agent Ryan Talbot who will testify generally concerning money laundering, as well as the methods and practices of drug dealers used to launder money.   Agent Talbot has not participated in the investigation of this case and the government will not ask Agent Talbot to express an opinion about the evidence in this case.   Rather, he will be offered solely to explain money laundering in general to assist the jury in understanding such evidence, which will be

complicated and beyond the ken of the average juror.   See United States v. Nektalov, 2004 WL 1469487 at *3-*4 (S.D.N.Y. 2004) (admitting expert testimony of IRS agent about money laundering techniques, the "regulatory framework that exists to combat" such techniques, and to "describe some of the ways money launderers attempt to avoid this framework[.]"; see also United States v. Dinero Express, Inc., 57 Fed. Appx. 456, 460 (2d Cir. 2002) (upholding expert testimony by FBI agent about the connections between drug trafficking and money laundering); United States v. Fernando-Jimenez, 2005 WL 729490 at *7 (S.D.N.Y. 2005) (permitting money laundering expert to testify "how money laundering operations develop and how they are carried out" without offering an opinion as to the defendant's guilt or role in the money laundering operation).

## EVIDENTIARY ISSUES

**A.**   **EVIDENCE OF UNCHARGED CRIMINAL CONDUCT COMMITTED PRIOR TO THE TIME OF THE CONSPIRACY RELATING TO THE FORMATION OF THE CONSPIRACY**

The government anticipates that some cooperating witnesses will provide historical testimony regarding the formation of the conspiracy charged in the Indictment.   That evidence may include testimony of certain events and circumstances which occurred prior to the date charged in the Indictment, that is 2008.   Some of the witnesses will generally discuss dealing drugs with Montague prior to 2008.   Without that background and understanding, the jury is otherwise left to guess how the narcotics conspiracy (for which Montague presently

stands charged) was formed and maintained, and how such witnesses and others became members of the operation.

While the admission of these so-called prior "bad acts" may appear to fall under FRE 404(b), this evidence is not considered 404(b) at all, but rather it is admissible as "direct evidence of the existence of the conspiracy" between Montague and others. United States v. Thai, 29 F.3d 785 (2d Cir. 1994); United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989). In fact, the Second Circuit has held repeatedly that it is within the Court's discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between co-conspirators. United States v. Rosa, 11 F.3d 315, 333-334 (2d Cir. 1993); see also United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1998) (evidence of uncharged conduct admitted because it informed the jury how the Latin Kings' racketeering and drug conspiracies evolved, and how illegal relationships and mutual trust developed between co-conspirators); United States v. Brennan, 798 F.2d 581, 589 (2d Cir. 1986)(other acts evidence properly admitted because "[w]ithout [it] the jury would have had a truncated and possibly confusing view of the respective role played by [the co-conspirators] and of the basis for the trust between [them]").

In United States v. Diaz, 176 F.3d 52 (2d Cir. 1999), the government sought to introduce evidence of uncharged prior unlawful conduct that were committed by the defendants and the government witnesses. The district court admitted the evidence over objection, it was relevant to prove the existence and nature of the conspiracy charged. The

Court of Appeals affirmed, stating that "where, as in this case, 'the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself.'" Id. at 79; citing United States v. Miller, 116 F.3d 641, 682 (2d Cir. 1997). The testimony of prior narcotics dealings with the defendants was admitted because it "informed the jury how the [conspiracy] evolved, and how illegal relationships and mutual trust developed between the co-conspirators." Id., at 79-80.

In United States v. LaSanta, 978 F.2d 1300 (2d Cir. 1992), the defendants challenged the admission of testimony by government witness "Crespo" concerning his involvement with the two defendants in drug transaction *several years* prior to the commencement of the charged conspiracy. There, the court did evaluate the issue under 404(b), and still permitted the testimony. The Second Circuit affirmed the trial court's ruling, stating "[o]ur decisions specifically approve the use of evidence of a defendant's prior narcotics dealings to delineate the background details of a conspiracy - to 'inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed.'" Id., at 1307; citing United States v. Pitre, 960 F.2d 112, 1119 (2d Cir. 1992).

In sum, whether the Court chooses to evaluate the issue in the context of a 404(b) application, or whether the Court determines that it is direct evidence, the result should be the same. Since the government would be offering the information as background to the crime charged, it is admissible in the government's direct case. The government will not belabor such testimony, but would prove it only to the extent and for the reasons set forth

above.   The government does agree that a cautionary instruction may be appropriate, advising the jurors that the defendant is on trial solely for the charges contained in the Indictment, and nothing more.


### B.    CO-CONSPIRATOR STATEMENTS


The government intends to elicit testimony from various cooperating witnesses regarding conversations they had involving the defendants and/or other co-conspirators. The conversations in which a defendant was a participant are admissible under Fed. R. Evid. 801(d)(2)(A) as admissions by a party opponent.


The conversations involving other co-conspirators are likewise admissible under Fed. R. Evid. 801(d)(2)(E).   That rule permits the conditional admission of out of court statements of co-conspirators as long as the government ultimately establishes by a preponderance of the evidence that there was a conspiracy, that both the declarant and the party against whom the statements are offered were members of the conspiracy, and that the statements were made during, and in furtherance of, the conspiracy.   United States v. Tellier, 83 F.3d 578, 580 (2d Cir. 1996); United States v. Tracy, 12 F.3d 1186, 1199 (2d Cir. 1993).


With respect to the first two requirements, the Court may consider the hearsay statements themselves, Bourjaily v. United States, 483 U.S. 171, 177-78 (1987), although the requisite findings regarding the existence of, and membership in, the conspiracy cannot be

based upon the statements alone. <u>Tellier</u>, 83 F.3d at 580; Fed. R. Evid. 801(d)(2)(E).   With respect to the second requirement, "[t]he standard for independent proof of participation [in the conspiracy] is 'lower than the standard of evidence sufficient to submit a charge of conspiracy to the jury' . . . and the proof may be 'totally circumstantial.'"   <u>United States v. Cicale</u>, 691 F.2d 95, 103 (2d Cir. 1982).   <u>See also</u> <u>United States v. Terry</u>, 702 F.2d 299, 320 (2d Cir. 1983).   "[A]ll that is required . . . is a 'showing of a likelihood of an illicit association between the declarant and the defendant.'"   <u>Cicale</u>, 691 F.2d at 103 (citation omitted).   <u>See also</u> <u>Terry</u>, 702 F.2d at 320.

With respect to the third criteria that the statement at issue be made in furtherance of the conspiracy, that requirement is satisfied if the statement is designed to promote or facilitate the achievement of the conspiracy's goals.   <u>United States v. Rivera</u>, 22 F.3d 430, 436 (2d Cir. 1994).   In this regard, statements made to a non-conspirator can still be admitted under Rule 801(d)(2)(E) if the purpose of making those statements was to facilitate the conspiracy's objectives. <u>Id.</u>; <u>see also</u>, <u>United States v. Minicone</u>, 960 F.2d 1099, 1110 (2d Cir. 1992). Furthermore, under the doctrine of completeness, portions of conversations which are not in furtherance of the conspiracy may still be admitted if they are necessary to make sense of the admissible portion of the conversation.   <u>United States v. Hong</u>, 917 F.2d 691, 701 (2d Cir. 1990); <u>United States v. Salerno</u>, 868 F.2d 524, 536 (2d Cir. 1989); <u>United States v. Nersesian</u>, 824 F.2d 1294, 1325 (2d Cir. 1987); <u>United States v. Grant</u>, 462 F.2d 28, 33-34 (2d Cir. 1972).

In this case, the proof at trial will demonstrate that Montague was a member of the continuing criminal enterprise, narcotics conspiracy, and money laundering conspiracy charged in Counts 1 through 3, respectively, and that defendants Palmer and Burton were members of the narcotics conspiracy for which they stand charged in Count 2.   With respect to co-conspirator statements, the government will elicit testimony from various cooperating co-conspirators regarding their discussions with their associates which pertained to, among other illicit topics, the operation of the charged conspiracy, the planning of various narcotics transactions, the respective roles and tasks of the various co-conspirators, including the defendants, and payment for work done on behalf of the conspiracy, among other topics. There can be little question that such statements "further[ed] the ends of the conspiracy" and are therefore admissible under Rule 801(d)(2)(E).   See, e.g., Tracy, supra, 12 F.3d at 1201 ("in furtherance" requirement met where co-conspirator "prompt[s] the listener -- who need not be a co-conspirator -- to respond in a way that promotes or facilitates the carrying out of a criminal activity"); United States v. Rastelli, 870 F.2d 822, 837 (2d Cir. 1983) ("current status of the conspiracy" and "the identity and activities of co-conspirators" are also made in furtherance of the conspiracy); United States v. Blackmon, 839 F.2d 900, 912-13 (2d Cir. 1988); United States v. Handy, 668 F.2d 407, 408 (8th Cir. 1982) (statement of one co-conspirator identifying another is in furtherance of conspiracy); United States v. Combindo Valencia, 609 F.2d 603, 632 (2d Cir. 1979) (statement regarding "source of supply" for narcotics made in furtherance of conspiracy).

C.      **FEDERAL RULE OF EVIDENCE 609**


1.      **Cross-Examination of Government Witnesses**


The defense has been provided with the criminal records for each of the government's

witnesses.   Defense counsel are reminded that the impeachment of witnesses with prior

convictions is governed by F.R.E. 609.


Pursuant to Rule 609(a)(1), felony convictions not more than 10 years old (calculated

from release from imprisonment) are generally admissible for impeachment purposes.


Pursuant to Rule 609(a)(2), however, misdemeanor convictions, also not more than

ten years old, are admissible only if they "involved dishonesty or false statement."

Misdemeanor convictions are usable for impeachment purposes only if they "bear <u>directly</u> on

the likelihood that the [witness] will <u>testify</u> truthfully."   <u>United States v. Hayes</u>, 553 F.2d

824, 827 (2d Cir. 1977).   Such convictions must be in the nature of "perjury or subornation

of perjury, false statement, criminal fraud, embezzlement, or false pretense" to be admissible

for impeachment purposes.   <u>Id.</u>


Misdemeanor convictions or arrests relating to petit larceny are not probative of

truthfulness and therefore the defendants should not be allowed to inquire into such

convictions and arrests.   Petit larceny is a misdemeanor, not a felony, and thereby does not

fall within the scope of Federal Rule of Evidence 609(a)(1), which generally permits prior

felonies to be used to impeach witnesses.   Rule 609(a)(2) is also inapplicable because, as the

Second Circuit and other courts have held, petit larceny is not a crime which "involve[s] dishonesty or false statement." <u>Id.</u> at 826 (use of the second prong of Fed. R. Evid. 609(a) is restricted to convictions that bear directly on the likelihood that the defendant will testify truthfully . . . crimes of stealth, such as burglary, or petit larceny, do not come within this clause.); <u>see also</u> <u>Martin v. National Railroad Passenger Corp.</u>, 1998 WL 575183 (S.D.N.Y. 1998) (petit larceny is not, <u>per se</u>, a crime involving deceit, dishonesty, or fraud); <u>Daniels v. Loizzo</u>, 986 F. Supp. 245, 248 (S.D.N.Y. 1997) (crimes of force such as armed robbery or assault, or crimes of stealth, such as burglary or petit larceny, do not come within Fed. R. Evid. 609(a)(2)).

Defendants should similarly <u>not</u> be permitted to inquire about misdemeanor convictions, arrests or allegations relating to force or violence, as such convictions or conduct are not probative of truthfulness.   <u>See</u> <u>Hayes</u>, 553 F.2d at 827 ("The use of the second prong of Rule 609(a) is thus restricted to convictions that bear directly on the likelihood that the defendant will testify truthfully (and not merely on whether he has a propensity to commit crimes).   It follows that crimes of force, such as armed robbery or assault, or crimes of stealth, such as burglary, or petit larceny, do not come within this clause.") (citations omitted); <u>United States v. Cudlitz</u>, 72 F.3d 992, 996 (1st Cir. 1996); <u>United States v. Fox</u>, 473 F.2d 131, 135 (D.C. Cir. 1972); <u>United States v. Sampol</u>, 636 F.2d 621, 656 n. 21 (D.C. Cir. 1980); <u>United States v. Page</u>, 808 F.2d 723, 730 (10th Cir. 1987); <u>Daniels v. Loizzo</u>, 986 F. Supp. 245, 248 (S.D.N.Y. 1997) (crimes of force such as armed robbery or assault do not come within Fed. R. Evid. 609(a)(2)).

Likewise, a witness's past instances of prostitution are not probative of truthfulness:

> Prostitution is not a crime involving dishonesty or deceit, such that a prior prostitution conviction might suggest that the victim has a history of lying and that his or her testimony may therefore be false. *Cf.* Fed. R. Evid. 609(a)(2). A prior prostitution conviction thus has relatively little impeachment value. On the other hand, in addition to possibly serving to harass or embarrass the victim, impeaching a victim in a prostitution case with the victim's prior prostitution conviction has the potential to unnecessarily confuse the jury by suggesting that, because prostitution is illegal, the victims' testimony is inherently suspect or that the defendant's alleged conduct is less culpable.

United States v. Thompson, 178 F. Supp. 3d 86, 94 (W.D.N.Y. 2016).


**2.     Cross-Examination of Defendants**


At this time, the government does not intend to cross examine any of the defendants about their prior convictions. Should any of the defendants testify and the government believe such testimony has opened the door to impeachment by a prior conviction, the government will raise the matter with the Court and counsel prior to any inquiry.


DATED:      Rochester, New York, March 5, 2018.

<div style="margin-left:40%">

JAMES P. KENNEDY, JR.
United States Attorney
Western District of New York


By:     s/ROBERT A. MARANGOLA
BRETT A. HARVEY
Assistant United States Attorneys
United States Attorney's Office
100 State Street, Suite 500
Rochester, New York 14614
585/263-6760
Robert.Marangola@usdoj.gov

</div>